# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ANDREW QUINN and JILL COLGAN,

     Plaintiffs,

v.

     Civil Action No. 09-408 (CKK)

DISTRICT OF COLUMBIA,

     Defendant.

## MEMORANDUM OPINION
(September 27, 2010)

This case arises under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.* Plaintiffs, Andrew Quinn and Jill Colgan, are parents of D.Q., a minor child born approximately fourteen weeks premature in May of 2006. They bring the instant suit against Defendant District of Columbia ("the District"), alleging that the District violated its obligations to provide D.Q. with early intervention services under Part C of the IDEA ("Part C"), 20 U.S.C. §§ 1431-45, and seeking reimbursement of $71,430.01 in costs expended on night nursing services provided to D.Q. from October 25, 2006, through July 2007. The District does not dispute that it violated its statutory obligations under Part C, but maintains that Plaintiffs are not legally entitled to reimbursement as they have failed to demonstrate that they are eligible for financial assistance under the District's regulations governing payments for Part C early intervention services. The parties have filed Cross-Motions for Summary Judgment, which are presently pending before the Court. Upon consideration of those motions, the parties' respective briefing, the administrative record, applicable case law, statutory, and regulator authority, as well as the record of this case as a whole, the Court shall DENY Plaintiffs' [12] Motion for Summary

Judgment and shall GRANT Defendant's [13] Cross-Motion for Summary Judgment, for the reasons set forth below.

## I. BACKGROUND

### A. Statutory Background

The IDEA's purpose is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs. . . ." 20 U.S.C. § 1400(d)(1)(A). To further this purpose, the IDEA's subchapter III ("Part C") provides "financial assistance to States to develop and implement a statewide . . . system that provides early intervention services for infants and toddlers with disabilities and their families." *Id.* § 1431(b)(1). Part C is intended to, *inter alia*, "enhance the development of infants and toddlers with disabilities, to minimize the potential for developmental delay, and to recognize the significant brain development that occurs during a child's first 3 years of life." *Id.* § 1431(a)(1).

To be eligible to receive federal funds under Part C, the District is required to adopt "a policy that appropriate early intervention services are available to all infants and toddlers with disabilities in the State and their families . . . ." *Id.* § 1434(1). Included in this policy must be a "comprehensive child find system" that endeavors to locate children in need of early intervention services. *Id.* at § 1435(a)(3). Specifically, a Part C recipient state must (1) "[e]nsure that referrals [of the child to the appropriate public agency] are made no more than two working days after the child has been identified," 34 C.F.R. § 303.321(d)(2)(ii); and (2) require that within forty-five days of a referral an evaluation and assessment of the child are made, and an Individualized Family Service Plan ("IFSP") meeting is convened, *id.* § 303.321(e)(2)(I)-(ii).

An IFSP meeting requires the attendance of, *inter alia*, the child's parents, the public agency employee responsible for implementing the IFSP, and the person evaluating and assessing the child. *See id.* § 303.343(a)(I), (iv)-(v). The meeting's purpose is to create an IFSP for the child, which is a written document that includes "a statement of specific early intervention services . . . necessary to meet the unique needs of the infant or toddler and the family, including the frequency, intensity, and method of delivery services." 20 U.S.C. § 1436(d)(4). Early intervention services are services performed by "qualified personnel, including . . . (viii) nurses," *id.* § 1432(4)(F), "to meet the developmental needs of an infant or toddler with a disability," *id.* § 1432(4)(D), including occupational therapy, *id.* § 1432(4)(E)(iv), physical therapy, *id.* § 1432(4)(E)(v), and "health services necessary to enable the infant or toddler to benefit from the other early intervention services," *id.* § 1432(4)(E)(x). Furthermore, public agencies must provide "[w]ritten prior notice . . . to the parents of a child eligible under this part within a reasonable time before a public agency or services provider proposes, or refuses, to initiate or change . . . the provision of appropriate early intervention services to the child and the child's family." 34 C.F.R. § 303.403(a); *see also* 20 U.S.C. § 1439(a)(6) (requiring written notice).

As is of particular relevance to the present litigation, early intervention services "are provided at no cost *except* where Federal or State law provides for a system of payments by families, including a schedule of sliding fees." 20 U.S.C. § 1432(4)(B) (emphasis added). The District is a recipient of Part C federal funds and, pursuant to section 1432(4)(B), has enacted a sliding fee scale governing payments for certain early intervention services covered under Part C

of the IDEA.[1]  Under these regulations, "[a] family of an eligible child with an income of two hundred percent (200%) or greater of the federal poverty guidelines . . . shall be required to pay the cost or a percentage of the cost for early intervention services" in accordance with the sliding fee scale set forth in D.C. MUN. REGS. tit. 22-B, § 3028.7.  Specifically, a family with an annual income of less than $28,701 pays 0% of the cost of early intervention services, with increasing responsibility for the percentage of the cost as the level of the family's income compared to the number of family members increases, until annual family income reaches $72,981, at which point the family becomes ineligible for financial assistance from the District and is responsible for 100% of the cost of early intervention services.  *Id.* at § 3028.1.  Accordingly, in approving an application for early intervention services under Part C, the Infant and Toddlers with Disabilities Division ("ITDD"), which is responsible for administering the District's Part C program, must determine what, if any, percentage of costs are assigned to the family under the District's sliding fee scale.  *Id.* §§ 3028.3-4.

### B.    Factual Background

#### 1.    D.Q.

Plaintiffs' minor child, D.Q., was born fourteen weeks premature in May 2006.  Pls.'

---

[1] Certain early intervention services are provided at no cost to the family, regardless of the family's financial ability to pay, including: "(a) Implementation of child find requirements; (b) Evaluation and assessment, for the purpose of determining whether an infant or toddler has a delay or disabilities which meet the District of Columbia definition of developmental delay; (c) Service coordination services; and (d) Administrative and coordinated activities related to: (1) The development, review, and evaluation of Individualized Family Service Plans; and (2) Implementation of the procedural safeguards."  D.C. MUN. REGS. tit. 22-B, §§ 3028.12-13. Payment for all other early intervention services is governed by the District's shifting fee scale set forth in section 3028.1.

Stmt.[2] ¶ 1-2; Admin. Record ("A.R.") at 5 (HOD), 125-26 (Letter from Alison Greenleaf, Nurse Practitioner, Coordinator of the High Risk/BPD/Apnea Clinic, Georgetown Univ. Hospital (Nov. 30, 2006)).  Due to severe heath complications, D.Q. remained hospitalized for the first five and a half months of his life.  Pls.' Stmt. ¶ 3; A.R. at 5 (HOD).  D.Q. was eventually discharged from the Hospital for Sick Children ("HSC") on October 25, 2006, with a diagnosis of chronic lung disease, gastroesophageal reflux, oral motor dysfunction, and a Grade III to IV intraventricular hemorrhage with hydrocephalus.  Pls.' Stmt. ¶ 10; Def.'s Stmt. ¶ 2; A.R. at 5 (HOD).

After being discharged, D.Q. continued to require nearly 24 hour care and monitoring. Pls'. Stmt. ¶ 11-14; A.R. at 125-26.  To assist with D.Q.'s care, Plaintiffs hired a night nursing service immediately upon D.Q.'s discharge from the hospital on October 25, 2006; Plaintiffs continued to receive night nursing services through July 2007.  Def.'s Stmt. ¶ 12; A.R. at 6 (HOD).  In addition to those night nursing services, D.Q. also received occupational therapy, physical therapy, and speech therapy.  Def.'s Stmt. ¶¶ 13-15.

### 2. Early Intervention Services

Although HSC is an authorized evaluation site for ITDD, only staff in HSC's outpatient, and not inpatient, section had received the training necessary to act as an authorized evaluator for

---

[2] The Court strictly adheres to the text of Local Civil Rule 7(h) when resolving motions for summary judgment.  *See Burke v. Gould*, 286 F.3d 513, 519 (D.C. Cir.2002) (finding district courts must invoke the local rule before applying it to the case).  The Court has advised the parties that it strictly adheres to Rule 7(h) and has stated that it "assumes facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." [8] Order at 3-4 (August 18, 2009).  Thus, in most instances the Court shall cite only to one party's Statement of Material Facts ("Stmt.") unless a statement is contradicted by the opposing party, in which case the Court may cite a party's Response to the Statement of Material Facts ("Resp. Stmt.").  The Court shall also cite directly to evidence in the record, where appropriate.

Part C early intervention services. Pls.' Stmt. ¶¶ 18-20. Consequently, D.Q. was not referred to ITDD until October 27, 2006, shortly after his discharge from HSC. *Id.* ¶¶ 22-23. At that time, Plaintiffs received a letter from ITDD advising Plaintiffs that D.Q. may be eligible to receive early intervention services. Def.'s Stmt. ¶ 4; A.R. at 226. An IFSP meeting was subsequently scheduled for December 15, 2009, nearly two months after D.Q.'s release from the hospital. Pls.' Stmt.¶ 24; Def.'s Resp. Stmt. ¶ 24. However, no representative from ITDD attended the meeting, as required, and only Ms. Colgan and a representative from HSC were in attendance. Pls.' Stmt. ¶ 26; A.R. at 6 (HOD).

Shortly thereafter, ITDD sent Plaintiffs a letter dated December 19, 2006, welcoming them to ITDD and providing Plaintiffs with a financial application. Def.'s Stmt. ¶ 5; A.R. at 227 (Letter from Tammy Proctor, Child Find Coordinator, ITDD). The letter advised that "[t]he application process allows families to request and receive financial assistance and is necessary to determine the family's cost participation for early intervention services based on the District of Columbia's sliding fee scale." A.R. at 227. Plaintiffs were further advised that if they failed to provide the required financial information, ITDD would "have no way of knowing how much the Part C office should contribute toward the payment of your child's services (if anything)" and the parents would therefore "be expected to bear all costs for the services your child may need." *Id.*

Plaintiffs were subsequently assigned an ITDD case manager, Badiya Sharif, then-Supervisory Transition Coordinator at ITDD. Pls.' Stmt. ¶¶ 31-32; Def.'s Resp. ¶¶ 31-32. Based upon Plaintiffs' December 2006 financial application, which included their previous year's tax return, *see* Administrative Hearing Transcript ("Tr.") at 202, Ms. Sharif concluded that "it did not look like [P]art C would pick up any costs for therapy services." Tr. at 195. This conclusion

6

was affirmed in the January 4, 2007 referral for early intervention services issued by Intervention Specialist Angela Herring on D.Q.'s behalf. Def.'s Stmt. ¶ 6; A.R. at 228 (Memorandum from Angela M. Herring, Intervention Specialist, ITDD (Jan. 4, 2007)). As set forth therein, Plaintiffs were noted to have private health insurance and were determined to be 100% responsible for the costs of D.Q.'s early intervention services under Part C. A.R. at 228. The referral memorandum further indicates that the family was attempting to negotiate a rate of reimbursement with their private insurance and that payment arrangements should be discussed before the start of services. *Id.*

Although Plaintiffs and Ms. Sharif informally engaged in several conversations during the next few months regarding D.Q.'s therapy needs, an IFSP meeting was not held until approximately three months later, on March 19, 2007. Pls.' Stmt. ¶ 36; Def.'s Stmt. ¶ 10; A.R. at 79-88 (the March 19, 2007 IFSP). During the intervening time period, Ms. Sharif assisted Plaintiffs in identifying and obtaining referrals to a physical therapist and an occupational therapist for D.Q. Tr. 139-40. Both services were being paid for at that time through Plaintiffs' insurance. *See id.* at 178-82. Plaintiffs also informed Ms. Sharif that they were providing night nursing services for D.Q., which services were at the time being paid directly by Plaintiffs themselves. *See id.* at 112, 156-57.

Upon being advised by Plaintiffs that they were paying for D.Q.'s night nursing services out-of-pocket, Ms. Sharif asked Plaintiffs to provide her with documents showing that the night nursing expenses had been paid for by Plaintiffs themselves. *Id.* at 196. Ms. Sharif believed that the costs associated with the night nursing services could be subtracted from Plaintiffs' annual income for purposes of determining Plaintiffs' eligibility for financial assistance under the

District's sliding fee scale. *Id.* at 200. Ms. Sharif therefore reduced Plaintiffs' income by the amount they had expended on the night nursing services and used this adjusted income figure to determine Plaintiffs' eligibility for financial assistance; using this method, she concluded that Plaintiffs were in fact eligible for 100% coverage of early intervention services under Part C. *See id.* at 200-03.

At the March 19, 2007 meeting, an IFSP was created for D.Q. *See* A.R. at 80-90 (March 19, 2007 IFSP). As is relevant here, Part IV of the standardized IFSP form, which is entitled "Services Needed to Achieve Early Intervention Outcomes," lists those services that ITDD has agreed to make available to the child. Pls.' Stmt. ¶ 38; A.R. at 88. Part IV of D.Q.'s March 19, 2007 IFSP specified that ITDD was to provide D.Q. with the following services: physical therapy, occupational therapy, and night nursing. Pls.' Stmt. ¶ 37; Def.'s Stmt. ¶ 10; A.R. at 6 (HOD), 88 (March 19, 2007 IFSP). Part IV of the IFSP further indicated that the form of payment — i.e., whether the services would be paid by the family, through insurance or medicaid, or through Part C funding — for each of these services was "to be determined." A.R. at 88. Despite this indication, both Plaintiffs and Ms. Sharif shared the expectation at that time that ITDD would be financially responsible for each of these services, including the night nursing services, based on her finding that Plaintiffs were eligible for 100% coverage for the cots of Part C services. Pls.' Stmt. ¶¶ 54-55, 59; Def.'s Resp. Stmt. ¶¶ 54-55, 59. However, because the "cost participation letter had not been completed at that point in time" and ITDD therefore did not yet have the "official documents that made [the early intervention services] billable to our office," Ms. Sharif indicated on the IFSP only that the form of payments was "to be determined." Tr. at 242-43.

In a follow-up email dated April 6, 2007, Plaintiffs inquired of Ms. Sharif if arrangements had yet been made with the night nursing service for direct billing. Pls.' Stmt. ¶ 61; A.R. at 127. Ms. Sharif responded that no such arrangement had been made, but that Plaintiffs should forward their credit card statements for the night nursing expenses to ITDD in the meantime. Pls.' Stmt. ¶ 62; A.R. at 128. Ms. Sharif reiterated the parties' understanding that ITDD would be financially responsible for the night nursing costs, and that the only issue still to be resolved was whether reimbursement would be retroactive to D.Q.'s discharge from the hospital in October 2006 or from January 2007 only. Pls.' Stmt. ¶ 62; A.R. at 128.

ITDD subsequently sent Plaintiffs a letter dated June 1, 2007, confirming that Plaintiffs were eligible for financial assistance under Part C. Pls.' Stmt. ¶ 50; A.R. at 161 (Letter from Tracie Bullock Dickson, Program Manager, ITDD, to Andrew Quinn (June 1, 2007)). Specifically, Plaintiffs were advised that, "[a]ccording to the sliding fee scale and other policies and procedures of the ITDD, your family will be responsible for paying 0% of the cost of services for your child after reimbursement from insurance and/or Medicaid." Pls.' Stmt. ¶ 50; A.R. at 161. In addition, Dr. Dickson's letter provided that Plaintiffs' "eligibility dates are retroactive from [January 1, 2007,] through [December 30, 2007]." Pls.' Stmt. ¶ 50; A.R. at 161. Consistent with this understanding, ITDD arranged for D.Q.'s physical and occupational therapy, which had previously been paid for by Plaintiffs' insurance, to be direct billed to ITDD; however, Plaintiffs continued to pay for the night nursing services directly out-of-pocket. *See* Tr. at 177-82.

An IFSP meeting was again held on June 15, 2007, to revise D.Q.'s IFSP, as needed. Def.'s Stmt. ¶ 13. At that time, it was determined that D.Q. would continue to receive physical

therapy, occupational therapy, and night nursing.  *Id.*  Another IFSP meeting was held thereafter

on August 22, 2007, to again revise D.Q.'s services as needed.  *Id.* ¶ 14.  At that time, it was

determined that D.Q. would continue with the physical therapy and occupational therapy; in

addition, speech therapy was added to the IFSP as a required service in Part IV.  A.R. at 119.

Because Plaintiffs had discontinued the night nursing services in July of 2007, those services

were no longer listed on the IFSP as a required service.  *Id.*; *see also* Def.'s Stmt. ¶ 12.  The

August 22, 2007 IFSP was also modified to reflect, for the first time, that ITDD was 100%

responsible for the costs of D.Q.'s physical therapy, occupational therapy, and speech therapy.

A.R. at 119.

> ### 3. ITDD Denies Plaintiffs' Request for Reimbursement for Night Nursing Expenses

Around the time of the June 15, 2007 IFSP meeting, ITDD program manager Dr. Dickson

for the first time "began to express doubts about whether she had the authorization to make night

nursing paid for through our office."  Tr. at 210.  The Court notes that ITDD's concern at this

time appear to have been focused solely on the night nursing services — and not on D.Q.'s

physical, occupational, or speech therapy — and whether the night nursing services were eligible

as a covered service under the Part C regulations; no question was raised at that time as to

Plaintiffs' financial eligibility under the District's sliding fee scale.  *See id.* at 208-09.  In an

effort to address her concerns, Dr. Dickson wrote an email dated November 27, 2007, to the

United States Department of Education ("DOE"), the federal agency that oversees the

administration of the IDEA, and inquired whether night nursing was a covered service under Part

C's regulations.  *See* A.R. at 45-46 (Letter from William W. Knudsen, Acting Director, Office of

Special Educ. Programs, DOE, to Tracie Bullock Dickson, Program Manager, ITDD ("DOE Letter")).

In June 2008, A.R. at 9 (HOD), the DOE responded and advised ITDD that early intervention services do not include those services "needed solely to meet life-sustaining needs for treatment of chronic medical conditions . . . ." *Id.* at 46 (DOE Letter). Based on this advice, Dr. Dickson sent Plaintiffs a letter dated June 19, 2008, informing them for the first time that D.Q.'s night nursing was not in fact reimbursable under Part C because night nursing was "medically necessary" and therefore was "not covered under Part C early intervention services." Def.'s Stmt. ¶ 16; A.R. at 39. The Court notes that this determination was based solely on the finding that night nursing services was not an eligible service and did not disturb ITDD's prior conclusion that Plaintiffs were eligible for 100% payments by ITDD for early intervention services covered by Part C.

On October 9, 2008, Plaintiffs filed a due process complaint notice alleging that the District violated the IDEA by failing to: (1) timely determine D.Q.'s eligibility for early intervention services, and (2) provide D.Q. all necessary early intervention services — namely, night nursing. Def.'s Stmt. ¶ 17; A.R. at 24-26 (due process complaint notice). Plaintiffs requested a declaration that the District had violated the IDEA and injunctive relief in the form of an order directing the District to reimburse Plaintiffs for $71,430.01 in night nursing expenses. Def.'s Stmt. ¶ 17; A.R. at 25-24 (due process complaint notice).

### 4. Due Process Hearing

A due process hearing was convened on November 25, 2008. Def.'s Stmt. ¶ 18. At the hearing, Plaintiffs argued that (1) the District violated the IDEA's "child-find" obligation; (2) the

District failed to provide timely written notice of its refusal to cover night nursing services; (3) the District failed to timely develop an IFSP for D.Q.; and (4) the District was obligated to reimburse Plaintiffs for night nursing expenses. Tr. at 14-16. The District, in contrast, argued that (1) as a recipient of federal funds under Part C, the District must adhere to the federal regulations that limit the allocation of Part C funds to only early intervention services; and (2) the District cannot reimburse Plaintiffs for night nursing because such services are for a medical necessity and, therefore, are not early intervention services. *See* Tr. at 17-18.

Prior to the introduction of testimony, Plaintiffs' counsel objected to the District's proposed exhibits 11-19, which were the documents Plaintiffs submitted to ITDD in December 2006 to determine their financial eligibility under Part C. Tr. at 29. Plaintiffs' counsel argued that Plaintiffs' finances were not relevant to the District's asserted defenses, were confidential, and, therefore, should not be included in the administrative record. Tr. at 29-30. The District's counsel offered various rationales for including the documents, including that "Part C is not automatic . . . which will be a major point of legal contention and argument between us." Tr. at 32. The hearing officer concluded that the documents would be initially excluded and then, if necessary, accepted into the record piecemeal. Tr. at 35. Ultimately, Plaintiffs' financial records were never admitted. *See* Tr. at 313. The parties called a total of three witnesses at the due process hearing: Ms. Colgan and Mr. Quinn for Plaintiffs, Tr. at 80, 145, and Ms. Sharif for the District, Tr. at 183. The witnesses' testimony largely reiterated the factual findings above and therefore shall not be repeated herein.

<u>5.</u>     <u>The Hearing Officer's December 3, 2008 Determination</u>

After the hearing, the hearing officer accepted the Parties' written closing arguments, *see*

Tr. at 310-12, and issued her determination on December 3, 2008. *See* A.R. at 2-21 (HOD). As set forth therein, the hearing officer concluded that the District had failed to satisfy its statutory obligation under the IDEA in three principal respects. First, the hearing officer found that the District failed in its child find obligation because D.Q.'s first valid IFSP was not drafted until March 19, 2007, three months after ITDD received D.Q.'s eligibility form, and nearly four months after HSC first referred D.Q.'s case to ITDD. *Id.* at 12, 17. Second, the hearing officer concluded that — contrary to ITDD's position in its June 2008 letter denying Plaintiffs' request for reimbursement — the night nursing services at issue in this case qualified as a covered service under Part C as the services were necessary to enable the child to benefit from other early intervention services, such as occupational and physical therapy. *Id.* at 13-14. Third, the hearing officer determined that Dr. Dickson's June 2008 letter denying Plaintiffs' request for reimbursement of the night nursing services, which was sent 18 months after Plaintiffs first made the request, violated the IDEA's timely notice provisions. *Id.* at 17-18. The hearing officer therefore concluded that "ITDD has an obligation to consider the night nurse services as an early intervention service" that is covered under Part C of the IDEA. *Id.* at 18.

Having found that the night nursing services at issue were covered by Part C, the hearing officer then turned to Plaintiffs' request for full reimbursement of their out-of-pocket costs associated with the night nursing services. As explained above and as emphasized by the hearing officer, early intervention services covered under Part C of the IDEA are to be provided "at no cost *except* where Federal or State law provides for a system of payments by families, including a schedule of sliding fees." *Id.* at 16 (quoting 20 U.S.C. § 1432(4)(B)) (emphasis added). Pursuant to this statutory authority, the District has "adopted a schedule of fees that essentially

13

means-test the reimbursement that would be available to the parents." *Id.* Moreover, the hearing officer found that "the evidence [in this case shows] that the [Plaintiffs] knew that their finances were relevant and necessary for the determination of what services would be financed by ITDD." *Id*.

Key to the present litigation, the hearing officer therefore concluded that — although the night nursing services were a covered service under Part C — Plaintiffs were not automatically entitled under the IDEA or District law to full reimbursement; rather, the question of if and how much Plaintiffs were entitled to be reimbursed for the night nursing expenses depended on their eligibility for financial assistance, as determined under the District's sliding fee scale. *See id.* at 16-17. The hearing officer further concluded that ITDD had erred in its method for calculating Plaintiffs' income for purposes of determining financial eligibility. Specifically, the hearing officer found that ITDD should not have taken "[Plaintiffs'] expenses of the night nurse [] into consideration when making the determination of eligibility for services, which allowed them a deduction sufficient to bring them to the threshold amount making them eligible to receive free services." *Id.* at 16. The hearing officer reasoned that Plaintiffs "cannot benefit from a discount twice, having the amount used to reduce their income for eligibility and now asking for the same amount to be reimbursed to them." *Id.* at 17. Accordingly, the hearing officer concluded that it was necessary to recalculate Plaintiffs' financial eligibility in order "to determine if the night nursing should have been covered by ITDD in its totality or [whether] some contribution from the parents was warranted under the DC sliding scale." *Id.* at 17. As the record then before the hearing officer lacked the information necessary to make this determination, the hearing officer ordered as follows:

[T]he ITDD must convene the authorized team or staff by December 30, 2008 to make the determination of the family's cost participation for early intervention services based on the District of Columbia's sliding rule for Part C 100% cost coverage eligibility current during the period of July 2006 through July 2007 and to determine the extent to which the expenses are reimbursable based on the family's financial situation during the same timeframe. The ITDD must take into consideration all the early intervention services including the night nurse the Child required from October 2006 through July 2007 and determine the eligibility of [Plaintiffs].

The [Plaintiffs] must along with the proof of payment provide the ITDD with invoices and documentation that reflects dates, times, person, services provided, rate charged for the services and the total amount billed for the night nursing services.

*Id.* at 18-19.[3]

6.      Post-Hearing Events

On December 9, 2008, ITDD sent Plaintiffs' counsel a letter requesting financial information, including 2006 and 2007 tax returns, bank statements from the last two months of 2006 and 2007, and valuations of assets held by Plaintiffs in 2006 and 2007. Def.'s Stmt. ¶ 28; A.R. at 375. Plaintiffs' counsel responded to ITDD by email dated December 11, 2008, in which he represented that Plaintiffs would not provide any of the requested financial information until ITDD explained "the exact regulations and procedures applied by ITDD to the determination in question." A.R. at 380. Counsel further stated that he "believe[d] that ITDD has most of [the information it was] requesting." *Id.* In response, ITDD provided Plaintiffs' counsel with a copy of the District's regulations. *See id.* at 382. In an email dated December 18, 2008, Plaintiffs' counsel responded that the regulations did not sufficiently resolve his questions regarding the

---

[3] Because Plaintiffs did not appeal ITDD's actions taken with respect to D.Q.'s physical, occupational, and speech therapy, the costs of which were paid directly by the District, the hearing officer did not consider and the HOD does not address the District's decision to fully fund those services based on its initial conclusion that Plaintiffs were eligible for financial assistance under the District's sliding fee scale.

procedures ITDD employed for determining financial ability under the District's sliding fee scale and again objected to ITDD's request for certain information, which Plaintiffs considered to be irrelevant to a determination of their financial eligibility for the night nursing expenses. *Id.* Plaintiffs' counsel further expressed "concern[] that ITDD appears to be preparing to re-decide a question [i.e., of Plaintiffs' financial eligibility] that they have already decided in my clients' favor," and advised ITDD that Plaintiffs would object to "any decision regarding finances that differs from that already made . . . — namely, that my clients qualified for 100% reimbursement. . . ." *Id.* ITDD responded by letter dated December 19, 2008, indicating generally that its request for Plaintiffs' financial information was "grounded squarely in the law and regulations," and offering to "sit down with [Plaintiffs and counsel] and explain how we have arrived at any calculations, once we have the information and have had an opportunity to review it." *Id.* at 386. By email dated January 12, 2009, Plaintiffs' counsel advised ITDD that it would not provide ITDD with any of the financial information requested. A.R. at 384.

On January 16, 2009, ITDD submitted a Compliance Status Report to the hearing officer regarding ITDD's compliance with the HOD. *See* A.R. at 370-74 (Jan. 16, 2009 Compliance Status Report). ITDD advised that it could not complete the necessary financial eligibility determination by December 30, 2008, in light of Plaintiffs' refusal to provide any of the requested financial information. *Id.* at 373. ITDD further explained that it did not believe it was obligated by either the HOD or the District's regulations to meet with Plaintiffs prior to, or to include them in, the financial eligibility determination process, which was a determination to be made by ITDD staff. *Id.*

Thereafter, on February 27, 2009, the Office of the State Superintendent of Education

("OSSE"), issued its Part C Participation Determination.  A.R. at 343-48 (Memorandum from John Parham Jr., Deputy Superintendent of Educ., Dist. of Columbia).  As set forth therein, OSSE found that Plaintiffs "have failed to provide any information to enable the OSSE to make the cost participation determination under Title 22, of the District of Columbia Municipal Regulations (DCMR) Section 22-3028 *et seq*.  Absent such information, the OSSE has no basis on which to find [Plaintiffs] eligible for reimbursement expenses for the 2006 through 2007 night nursing services." *Id.* at 343.  OSSE advised that it would provide Plaintiffs with "a final opportunity to submit to the OSSE their 2006 and 2007 income documentation needed to make a cost participation determination under the HOD." *Id.*  If Plaintiffs failed to do so, OSSE's determination that it was unable to evaluate Plaintiffs' financial eligibility would become "the final agency decision in this matter." *Id.*  The record does not reflect that Plaintiffs ever responded to this request or appealed the District's decision on this point.

On March 3, 2009, Plaintiffs filed their [1] Complaint in this case appealing the December 3, 2008 HOD and seeking reimbursement of the costs paid in association with D.Q.'s night nursing services.  Compl. ¶ 1.  Plaintiffs' Complaint contains two counts, each arising solely under the IDEA.  *See generally id.*  Count I alleges that the District violated the IDEA's "comprehensive child find system." Compl. ¶¶ 20-23.  Count II alleges that the District failed to provide to Plaintiffs all necessary intervention services in violation of the IDEA.  Compl. ¶¶ 24-26.  Plaintiffs request that the Court find that the District violated the IDEA and order the District to reimburse them for $71,430.01 in night nursing expenses.  Compl. at 5.

The parties subsequently filed the now-pending Cross-Motions for Summary Judgment. *See* Plaintiffs' [12] Motion for Summary Judgment ("Pls.' MSJ"); Defendant's [13] Opposition

to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment ("Def.'s MSJ"). Plaintiffs also filed a combined [15] Opposition to the District's Cross-Motion for Summary Judgment and Reply in Support of their Motion for Summary Judgment ("Pls.' Opp'n").[4] The District in turn subsequently filed a [17] Reply in support of its Motion for Summary Judgment ("Def.'s Reply"). Briefing with respect to the parties' Cross-Motions for Summary Judgment is now complete, and the issues are ripe for the Court's review and resolution.

## II. LEGAL STANDARD

Under Part C of the IDEA, a "party aggrieved by the findings and decision regarding an administrative complaint" may "bring a civil action" in a state court of "competent jurisdiction" or in federal court "without regard to the amount in controversy." 20 U.S.C. § 1439(a)(1). The court of review "shall receive the records of the administrative proceedings, shall hear evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court deems appropriate." *Id.* Upon review, the party challenging the

---

[4] Plaintiffs have submitted the Declaration of Jill Colgan as an exhibit to their Opposition briefing. *See* Pls.' Opp'n, Ex. 2 ("Colgan Decl."). The two-page exhibit solely addresses events that occurred after the issuance of the December 3, 2008 HOD in this case. *See id.* Pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii), a court may "hear additional evidence at the request of a party" in an action brought under the IDEA. "However, a court's power to supplement the record 'entail[s] broad discretion and implicate[s] equitable considerations.'" *Pabo v. Dist. of Columbia*, 573 F. Supp. 2d 41, 46 (D.D.C. 2008) (alteration in original) (quoting *Reid v. Dist. of Columbia,* 401 F.3d 516, 522 (D.C. Cir. 2005)). For the reasons set forth below, the Court finds that evidence regarding events subsequent to the December 3, 2008 HOD are not relevant to the resolution of Plaintiffs' Complaint. *See infra* pp. 27-28. Accordingly, because the Colgan Declaration's evidence relating to post-hearing events is not necessary to the Court's decision in this case, the Court has not considered the declaration in setting forth the relevant factual background or in reaching its decision herein. *Cf. Dist. of Columbia v. Abramson*, 493 F. Supp. 2d 80, 83 (D.D.C. 2007) (considering additional evidence only "to the extent that is necessary to resolve the issues in this case").

administrative determination bears the burden of proof and must "'at least take on the burden of persuading the court that the hearing officer was wrong.'" *Reid v. Dist. of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005) (quoting *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1989)).

The IDEA's preponderance-of-the-evidence standard does not grant the reviewing court unfettered *de novo* review. *See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1980) ("Thus the provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review."). Rather, courts must give "'due weight' to the administrative proceedings," and "'[f]actual findings from the administrative proceedings are to be considered prima facie correct.'" *Roark v. Dist. of Columbia,* 460 F. Supp. 2d 32, 38 (D.D.C. 2006) (quoting *S.H. v. State-Operated Sch. Dist. of the City of Newark,* 336 F.3d 260, 270 (3d Cir. 2003)). However, because the IDEA permits a reviewing court to "hear additional evidence at the request of a party," 20 U.S.C. § 1439(a)(1), the IDEA permits "less deference than is conventional in administrative proceedings," *Reid*, 401 F.3d at 521 (quoting *Kerkam*, 862 F.2d at 887). In a civil action reviewing an IDEA administrative determination, "[a] motion for summary judgment operates as a motion for judgment based on the evidence comprising the record and any additional evidence the Court may receive." *Robinson v. Dist. of Columbia*, 637 F. Supp. 2d 11, 16 (D.D.C. 2009); *Gregory-Rivas v. Dist. of Columbia*, 577 F. Supp. 2d 4, 7 n.2 (D.D.C. 2008); *see also Heather S. v. Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997) ("[T]he motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record.").

# III. DISCUSSION

Notwithstanding the parties' extensive briefing and the lengthy factual background of this case, the issue now before the Court is a relatively simple one — whether Plaintiffs are legally entitled to reimbursement from the District for costs associated with night nursing services provided to D.Q. from October 2006 through July 2007. All other remaining issues were decided by the hearing officer in Plaintiffs' favor, and the District has not appealed those decisions. The hearing officer found, and the District does not now dispute, that the District violated the IDEA's "child find" and timely notice provisions and that, contrary to the District's June 2008 determination, the night nursing services at issue in this case qualify as early intervention services covered under Part C of the IDEA. Nor is there any dispute between the parties that Plaintiffs may be awarded reimbursement under Part C for "expenses that [the District] should have paid all along and would have borne in the first instance." *Sch. Comm. of the Town of Burlington, Massachusetts v. Dep't of Educ. of Massachusetts*, 471 U.S. 359, 370 (1985).[5]

---

[5] Part C of the IDEA authorizes a reviewing court to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1439(a)(1). Plaintiffs maintain, and the District has not disputed, that reimbursement of expenses is a permissible and appropriate remedy under this provision. *See* Pls.' MSJ at 17-18. Although it is well established that reimbursement is an appropriate remedy under Part B of the IDEA, *Sch. Comm. of the Town of Burlington, Massachusetts v. Dep't of Educ. of Massachusetts*, 471 U.S. 359, 370 (1985) ("[W]e are confident that by empowering the court to grant 'appropriate' relief Congress meant to include retroactive reimbursement to parents as an available remedy in a proper case."), whether this relief is equally appropriate under Part C of the IDEA is an issue of first impression in this circuit. Other courts, however, have held that reimbursement is equally appropriate relief under Part C of the IDEA based on the Supreme Court's reasoning in *Burlington*. *See, e.g., Bucks Cnty. Dep't of Mental Health/Mental Retardation v. Pennsylvania*, 379 F.3d 61, 63 (3d Cir. 2004) (finding that "under the particular circumstances of this case . . . reimbursing the parent for her time spent in providing therapy is 'appropriate' relief" under Part C). Ultimately, because the District does not dispute that the Court may award reimbursement to Plaintiffs for "expenses that [the District] should have paid all along and would have borne in the first instance," *Burlington,* 471 U.S. at 370, the Court shall assume without deciding that such relief is appropriate under

20

Accordingly, the sole focus of the present litigation is Plaintiffs' challenge to the hearing officer's finding that Plaintiffs were not automatically entitled to full reimbursement of the covered night nursing services. As explained above, the hearing officer concluded that the question of if and how much Plaintiffs were entitled to be reimbursed for the night nursing expenses depended on their financial eligibility as determined under the District's sliding fee scale, which determination the hearing officer stated must be made without first reducing Plaintiffs' income by the amount paid for the night nursing services. Plaintiffs contend that the hearing officer's refusal to award Plaintiffs with full reimbursement of their night nursing expenses was in error. For the reasons set forth, the Court disagrees and finds that Plaintiffs have failed to demonstrate that the hearing officer erred in holding that Plaintiffs are legally entitled to reimbursement of the night nursing costs only to the extent permitted by the District's regulatory payment system.

Part C of the IDEA requires that early intervention services "are provided at no cost *except* where Federal or State law provides for a system of payments by families, including a schedule of sliding fees." 20 U.S.C. § 1432(4)(B) (emphasis added). The District has enacted such a system of payments. *See* D.C. MUN. REGS. tit. 22-B, § 3028. Families in the District that receive services covered by Part C of the IDEA therefore are not automatically entitled to full reimbursement of any associated costs, but must instead qualify as eligible for reimbursement under the District's schedule of fees. *See id.* As the hearing officer correctly noted, the District's schedule "essentially means-tests the reimbursement that would be available to the parents." A.R. at 16. As explained above, under the District's payment system, families with an income of

Part C of the IDEA.

21

less than two hundred percent (200%) of the federal poverty guidelines are not required to pay any costs of the services provided under Part C. *See id.* § 3028.7. Families with an income equal to or greater than two hundred percent (200%) of the federal poverty guidelines, however, are required to pay the cost or a percentage of the costs for early intervention services as determined under the District's sliding fee scale. *Id.*

Accordingly, the hearing officer's conclusion that the night nursing services were covered under Part C of the IDEA was only the first step in determining whether Plaintiffs were entitled to reimbursement for costs associated with such services. At the second and final step, the hearing officer was required to determine whether, and if so how much, Plaintiff was entitled to be reimbursed for those costs under the District's sliding fee scale. As to this latter point, the hearing officer found that in calculating Plaintiffs' financial eligibility under D.C. MUN. REGS. tit. 22-B, § 3028, ITDD had incorrectly reduced Plaintiffs' income by the night nursing expenses, thereby permitting Plaintiffs to "benefit from a discount twice, having the amount used to reduce their income for eligibility and now asking for the same amount to be reimbursed to them." A.R. at 17. As this assessment of Plaintiffs' financial eligibility was incorrect, the hearing officer ordered ITDD to reassess Plaintiffs' eligibility for reimbursement consistent with this interpretation of the District's regulations — i.e., without reducing Plaintiffs' income by night nursing expenses.

Given the "due weight" properly bestowed on the administrative proceedings belwo, *see Roark*, 460 F. Supp. 2d at 38, the Court finds the hearing officer's determination on this point and her interpretation of the District's regulations are reasonable. The District's regulations provide that eligibility under its Part C program is determined based on the number of

individuals in the family and the family's annual, monthly, or weekly "income." D.C. MUN. REGS. tit. 22-B, § 3028.1. Although the regulation does not define "income," the term is generally defined as the "money or other form of payment that one receives . . . from employment, business, investments, royalties, gifts, and the like." BLACK'S LAW DICTIONARY 831 (9th 3d. 2009). *See also* WEBSTER'S THIRD INTERNATIONAL DICTIONARY 1143 (1981) (defining "income" as "the value of goods and services received by an individual in a given period of time"). Consistent with this understanding of the term "income," the hearing officer determined that Plaintiffs' eligibility for reimbursement should have been made on the basis of their family income, and not on the basis of their family income minus the night nursing expenses. Nothing in the regulation suggests to the contrary that a family's expenses should first be deducted from their income in making this inquiry. The hearing officer's interpretation of the regulation was therefore reasonable.

Significantly, Plaintiffs themselves do *not* argue that the hearing officer's interpretation of the District's regulations was unreasonable or incorrect. *See generally* Pls.' MSJ at 23-24. Nor do Plaintiffs assert that they qualify as eligible for 100% reimbursement under this interpretation of the District's regulations. *See generally id.* Plaintiffs instead argue simply that the hearing officer was bound by the District's prior — albeit incorrect — determination that Plaintiffs were eligible for 100% reimbursement under the District's fee schedule. Plaintiffs reason as follows: (a) the District originally determined Plaintiffs to be eligible for 100% reimbursement of Part C services; (b) although the District subsequently denied Plaintiffs' reimbursement for the night nursing services, it did so solely on the basis that such services were not covered under Part C and not on the basis that Plaintiffs failed to qualify for financial assistance under the District's

sliding fee scale; (c) therefore, having concluded that night nursing services were covered under Part C, the hearing officer was required to automatically find that Plaintiffs were entitled to full reimbursement for those costs based on the District's previous determination that Plaintiffs were eligible for 100% payments under Part C, even if that determination was legally incorrect.

Plaintiffs have offered no case law or legal authority to support this position, and the Court finds that their argument is wholly without merit. Plaintiffs' due process complaint alleged that the District violated the IDEA and sought an order awarding Plaintiffs reimbursement in the amount of $71,430.01 for expenses paid in association with the night nursing services. The hearing officer held, and Plaintiffs do not now dispute, that Plaintiffs bore the burden of proof at the due process hearing and were therefore required to prove that they were legally entitled to the requested relief. A.R. at 11. Although the District itself did not argue before the hearing officer that Plaintiffs were financially ineligible for reimbursement under the District's sliding fee scale, it was not the District's burden to disprove Plaintiffs' entitlement to a full reimbursement of all costs. Plaintiffs themselves bore the burden of demonstrating that the District violated the IDEA and that Plaintiffs were legally entitled to reimbursement of all costs expended in association with the night nursing services under Part C of the IDEA. This required Plaintiffs to prove — and the hearing officer to find — both that the night nursing services were covered by Part C and that Plaintiffs were financially eligible for assistance under the District's sliding fee scale.

In this case, the hearing officer found that the District's determination that Plaintiffs' were eligible for 100% reimbursement under the sliding fee scale was based on an erroneous calculation of Plaintiffs' income. Plaintiffs' offer no legal support for their apparent claim that

the hearing officer lacked the legal authority to correct this error in the District's eligibility finding, and the Court is not so persuaded. *Cf. Day v. McDonough*, 547 U.S. 198, 210 (2006) ("if a judge does detect a clear computation error, no rule, statute, or constitutional provision commands the judge to suppress that knowledge"). The Court further notes that although the hearing officer was ultimately unable to determine on the record then before her whether Plaintiffs in fact qualified for financial assistance under D.C. MUN. REGS. tit. 22-B, § 3028, the evidence that was in the record on this point strongly indicated that Plaintiffs did not in fact qualify for financial assistance under the District's regulations, as properly interpreted. Ms. Sharif testified that Plaintiffs were initially determined to be ineligible for financial assistance from the District for the costs associated with their Part C services, and it was only after the out-of-pocket expenses for the night nursing had been subtracted from their income that their income was sufficiently reduced as to make them eligible for financial assistance. Tr. at 200-03. The hearing officer therefore appropriately ordered "ITDD [to] convene the authorized team or staff by December 30, 2008 to make the determination of the family's cost participation for early intervention services based on the District's sliding rule for Part C 100% cost coverage eligibility current during the period of July 2006 through July 2007 and to determine the extent to which the expenses are reimbursable based on the family's financial situation during the same time frame." A.R. at 19. While Plaintiffs broadly claim that "[t]here was no factual or legal basis for the Hearing Officer's arbitrary decision to require the Plaintiffs to re-qualify when the District had already determined that they were eligible for reimbursement," it is readily apparent from the Court's discussion above that the hearing officer had both a sound legal basis and an adequate factual predicate for ordering ITDD to reassess Plaintiffs' financial eligibility under the District's

sliding fee scale.

Plaintiffs' remaining arguments to the contrary are equally without merit. First, Plaintiffs argue that they are automatically entitled to full reimbursement of all night nursing costs as a result of ITDD's admitted procedural violations of the IDEA — namely, ITDD's failure to provide timely notice to Plaintiffs that it would not reimburse them for the costs of the night nursing services. Pls.' Opp'n at 4- 5 ("Plaintiffs are entitled to reimbursement for the violation of the notice provision of the IDEA alone."). The Court is not so persuaded. Plaintiffs offer no case law or other legal authority to support their claim that procedural violations of the IDEA automatically entitle them to full reimbursement of costs under Part C. To the extent that Plaintiffs suggest they are entitled to an award of the full costs of the night nursing services — not as reimbursement for expenses that the District "should have paid all along and would have borne in the first instance," *Burlington,* 471 U.S. at 370 — but as compensation for ITDD's procedural violations, it is well established that "[c]ompensatory damages [] are not available under the IDEA," *Rempson v. Dist. of Columbia*, 524 F. Supp. 2d 35, 39 (D.D.C. 2007). *See also Walker v. Dist. Court*, 157 F. Supp. 2d 11, 30 (D.D.C. 2001) ("Compensatory damages . . . are not available under the IDEA.").

Second, Plaintiffs argue that by listing night nursing in Part IV of D.Q.'s first two IFSPs, the District became financially responsible for Plaintiffs' night nursing expenses. Pls.' MSJ at 21-22. According to Plaintiffs, services that are covered under Part C of the IDEA are listed in Part IV of an IFSP, while necessary, but ineligible, services are listed in Part V of an IFSP. *See id.* Thus, Plaintiffs argue that by listing night nursing services in Part IV of D.Q.'s IFSP, the District became financially responsible for those costs. *See id.* The Court disagrees. While it

may be that the inclusion of the night nursing services in Part IV of the IFSP supports a finding that the District considered those services to be covered under Part C of the IDEA, it does not support a finding that the District is 100% responsible for the costs of those services. As previously explained, whether a service is covered by Part C is only the first step in determining whether, and if so how much, a family is entitled to be reimbursed for the costs of these services. The second and final step requires ITDD to assess a family's eligibility for financial assistance under the District's sliding fee scale.

Third, Plaintiffs argue that the District has already determined Plaintiffs to be eligible for financial assistance and nothing in the District's regulations "permit" ITDD to conduct "an after-the-fact," "post-hoc" review of that determination. Pls.' Opp'n at 8. This argument ignores that ITDD was ordered by the hearing officer to reassess Plaintiffs' financial eligibility under the District's sliding fee scale. Absent a showing that the order was wrong — a showing which Plaintiffs have not made — ITDD is both authorized to and required to comply with the HOD.

Fourth, Plaintiffs contend that the post-hearing events in this case also "warrant a decision in favor of Plaintiffs." Pls.' Opp'n at 8. According to Plaintiffs, the District has deviated from its standard practice in assessing a family's financial eligibility under the District's sliding fee scale. *See id.* at 8-10. Plaintiffs have therefore refused to provide any of the requested financial information to ITDD, indicating that they "are under no obligation to participate in the process when the Hearing Officer issues a final order." *Id.* at 8. The District for its part maintains that the information it has requested from Plaintiffs is appropriate and fully grounded in the District's regulations. *See* Def.'s MSJ at 22-23. Because the Court finds that the post-hearing events discussed by the parties are not relevant to the sole issue now before the

Court — namely, whether the December 3, 2008 HOD order requiring ITDD to reassess Plaintiffs' financial eligibility was correct — it need not resolve this dispute. As explained above, OSSE issued its final Part C Participation Determination on February 27, 2009, concluding that it was unable to "find [Plaintiffs] eligible for reimbursement expenses for the 2006 through 2007 night nursing services," given Plaintiffs' failure to provide the requested information. A.R. at 343 (Memorandum from John Parham Jr., Deputy Superintendent of Educ., Dist. of Columbia). That determination became the final agency decision regarding Plaintiff's financial eligibility on March 6, 2009. *See id.* Plaintiffs did *not* appeal that final agency decision nor does their present Complaint seek a Court order to enforce the December 3, 2008 HOD by requiring the District to properly evaluate Plaintiffs' eligibility for financial assistance under Part C of the IDEA; indeed, Plaintiffs do not argue that they would qualify as eligible for 100% reimbursement of their night nursing costs under the District's sliding fee scale, as properly interpreted. *See generally* Pls.' MSJ; Pls.' Opp'n. Plaintiffs instead filed the instant lawsuit challenging the hearing officer's authority to order a reassessment of Plaintiffs' eligibility under the District's fee schedule in the first instance. Plaintiffs contend that the HOD itself is in error and seek an order requiring the District to directly reimburse Plaintiffs for the full costs of the their night nursing services without first reassessing their eligibility under the District's sliding fee scale. The District's post-hearing conduct therefore is not relevant to the only question now at issue.[6]

_____

[6] The Court nonetheless notes that while Plaintiffs have indicated that they refused to provide the requested financial information to ITDD because certain of the information appeared to be irrelevant or duplicative, Plaintiffs have offered no legal support for their claim that the District's requests were improper. Moreover, it is readily apparent from the evidence in the record that Plaintiffs were fundamentally opposed to any effort by ITDD "to re-decide a question

Fifth and finally, Plaintiffs argue that even if they are not entitled to reimbursement of the night nursing services under the IDEA, they are nonetheless entitled to reimbursement under the theory of promissory estoppel. Pls.' MSJ at 26. The Court notes that Plaintiffs did not plead a common law claim of promissory estoppel in their Complaint nor does the Complaint contain any suggestion that Plaintiffs intended to assert such a claim. Plaintiffs' Complaint asserts only two counts, each of which is predicated upon a violation of the District's statutory obligations under the IDEA. *See generally* Compl. It is well established that "plaintiff[s] may not, through summary judgment briefs, raise new claims" where such claims were "not raise[d] [] in [the] complaint" and plaintiffs have "not file[d] an amended complaint." *Sharp v. Rosa Mexicana, D.C., LLC*, 496 F. Supp. 2d 93, 97 n.3 (D.D.C. 2007); *see also Juergens v. Urban Title Servs., Inc.*, 652 F. Supp. 2d 51, 62 (D.D.C. 2009) ("Plaintiff cannot amend her complaint by merely . . . filing a motion for summary judgment; she must amend her complaint in accordance with Fed. R. Civ. P. 15(a)."). Accordingly, the Court does not reach the merits of Plaintiffs' claim of promissory estoppel, which is asserted for the first time in their Motion for Summary Judgment.

Plaintiffs have taken the position in the instant lawsuit that they are entitled to reimbursement under Part C of the IDEA — regardless of whether they in fact qualify for

[i.e., of Plaintiffs' financial eligibility] that they have already decided in my clients' favor." A.R. at 382. Plaintiffs' counsel in fact advised ITDD that Plaintiffs would object to "any decision regarding finances that differs from that already made . . . — namely, that my clients qualified for 100% reimbursement. . . ." *Id.* Ultimately, then, it appears that Plaintiffs refused to provide the requested information, not because of their belief that such information was immaterial or inappropriate, but because they believed that ITDD was without authority to reassess Plaintiffs' financial eligibility, notwithstanding the hearing officer's order directing ITDD to do so. As such, it is clear that the parties' dispute regarding the post-hearing events is at bottom a dispute as to the hearing officer's authority to require ITDD to reassess Plaintiffs' financial eligibility under the District's sliding fee scale.

financial assistance under the District's sliding fee schedule — based on the District's initial, albeit erroneous, finding that Plaintiffs were eligible for 100% reimbursement. While the Court understands Plaintiffs' frustrations with the District's handling of their reimbursement request in this instance, Plaintiffs have not demonstrated that they are legally entitled to such reimbursement under the IDEA nor have they shown that the hearing officer's order requiring ITDD to correctly reassess Plaintiffs' eligibility for financial assistance was in error. Their request for relief must therefore be denied.

### III. CONCLUSION

For the reasons set forth above, the Court shall DENY Plaintiffs' [12] Motion for Summary Judgment and shall GRANT Defendant's [13] Cross-Motion for Summary Judgment. An appropriate Order accompanies this Memorandum Opinion.

Date: September 27, 2010

_/s/_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge